[Crim. No. 7368. In Bank. March 20, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. CARL AL-
FRED QUICKE, Defendant and Appellant.

Frank L. Williams, Jr., Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—A jury found defendant guilty of murder in the first degree, found that he was sane at the time of the killing, and fixed the penalty at death. The trial court denied a motion for new trial. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant, 18 years old, left his home in Lompoc in the early morning of November 8, 1962, to look for work. He was unable to find work and drove to Orange, where he arrived in the early afternoon. He stopped repeatedly to put water into his automobile, which was overheating because of a leak in the radiator. From Orange he went to Santiago Canyon, where he once lived. During the course of the afternoon he spent considerable time looking for girls. He told a young male friend that ''he was going to get a piece before he left the canyon'' and that he was ''going to get a piece from V—...'' a local girl. He tried unsuccessfully to find this girl

and several other girls he had known in Santiago Canyon. He then remembered Susan Nash, the victim, with whom he had gone to school. At about 6:30 or 7 o'clock in the evening he called on her at her home, and she agreed to go with him to a drive-in movie.

According to defendant's extrajudicial statements and his testimony at the trial, he and Miss Nash went to the drive-in theater, left there at about 1 a.m. and drove in the direction of Miss Nash's home. On the way up the canyon the automobile overheated, and defendant stopped at the side of the road. After talking for a few minutes, defendant put his right arm around Miss Nash and tried to kiss her. She resisted, saying "she didn't kiss on the first date." Defendant placed his right hand tightly over her mouth and nose, pulled her toward him and held her. When she attempted to attract the attention of a passing motorist by blowing the horn, defendant pulled her hand from the horn ring and in doing so broke the ring. She got free after a struggle and asked to be taken home. When defendant refused, she asked "What kind of girl do you think I am?" Defendant replied that he thought she was a "very nice girl." She then said, "Well, you sure aren't acting like it." Defendant again placed his hand over her mouth and nose, and shortly thereafter began to strangle her. He released her once and finding that she was gasping for air, strangled her again until "she just didn't seem that she was breathing any more."

Although defendant thought Miss Nash was dead, he removed his belt, "looped it around her neck," and pulled it tight. He then drove 6 miles to a more isolated area, spent several minutes smoking, and after fondling the body, undressed it and took off most of his own clothes. He pulled the body into the back seat where he fondled the vagina, bit a breast, and had sexual intercourse with the body.

Approximately two hours later two police officers noticed the parked automobile and found defendant asleep in the back seat with the body. Defendant willingly made several statements, which were tape-recorded, relating the events of the evening. He denied intending to have intercourse with the victim before he killed her and denied intending to kill her. He explained that his behavior was caused by his having been jilted frequently and by his being angered by the victim's refusal to kiss him.

At the trial defendant admitted that two weeks before the killing he had smothered another girl by holding his hand

tightly over her mouth and nose until she agreed to engage in sexual intercourse with him. This girl testified that she accepted defendant's invitation to go to a drive-in movie and that he refused to take her home after the movie, saying that he wanted "to go riding for a while." He then took her to an isolated area, where he attempted to kiss her and asked her to get into the back seat of his automobile. She refused to kiss him, stating that she had a sore throat from tonsilitis. Defendant placed his hand over her mouth and nose making it "hard to breathe." She testified that she was so frightened that she agreed to get into the back seat and do what he wanted.

Defendant contends that since he testified that he did not intend to kill or to rape and choked the victim only because he was frustrated and angered by her refusal to kiss him and since there was no direct testimony as to his state of mind, the evidence does not support a finding of intentional, premeditated killing or of killing in the perpetration of rape.

To support the verdict, however, "direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference." (*People* v. *Cartier*, 54 Cal.2d 300, 305-306 [5 Cal. Rptr. 573, 353 P.2d 53].) A finding of specific intent to rape may also be based on inferences from the evidence. (*People* v. *Cheary*, 48 Cal.2d 301, 310 [309 P.2d 431] ; see also *People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086] ; *People* v. *Love,* 53 Cal.2d 843, 850-851 [3 Cal. Rptr. 665, 350 P.2d 705].)

The evidence supports the verdict of murder in the first degree on the ground that the killing was intentional and premeditated or that it was done in the perpetration of rape. Defendant spent the afternoon of the killing in Santiago Canyon looking for girls. That he was contemplating sexual intercourse is shown by his statement that he was "going to get a piece before he left the canyon" and by his seeking the girl he said he was going to get it from. Defendant followed the same procedure with the victim that he had used successfully two weeks before. At the point where her predecessor capitulated because her life was threatened, the victim remained adamant, and defendant killed her. He then drove to a less travelled area and took considerable pains to arrange the corpse for intercourse. The similarity in details

of the two evenings, the fact that the defendant used such force as to threaten the first girl's life, the fact that he engaged in intercourse after the victim was dead, and the circumstances indicating that he went to Santiago Canyon with the intention of having sexual intercourse, support the inference that upon preconceived reflection he deliberately formed a plan to coerce the victim into engaging in intercourse with him while she was alive, or if that failed, to kill her to satisfy his desires with her corpse.

Defendant concedes that under the M'Naughton test, the evidence adduced at the sanity trial is sufficient to support the jury's finding that he was legally sane,[1] but contends that we should replace that test by the one proposed in 1962 by the Special Commissions on Insanity and Criminal Offenders.[2] We are not persuaded to do so, however, and adhere to our numerous decisions on the subject. (*People* v. *Nash*, 52 Cal.2d 36, 48 [338 P.2d 416]; *People* v. *Darling*, 58 Cal.2d 15, 22-23 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Rittger*, 54 Cal.2d 720, 732 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Berry*, 44 Cal.2d 426, 433 [282 P.2d 861]; *People* v. *Daugherty*, 40 Cal.2d 876, 894 [256 P.2d 911].)

Defendant contends that the trial judge was biased and that he failed to review the evidence as required by section 1181 of the Penal Code before passing on a motion for new trial. (*People* v. *Love*, 56 Cal.2d 720, 728 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Moore*, 53 Cal. 2d 451, 454 [348 P.2d 584].)

When the jury returned its verdict imposing the death penalty, the court commended the jurors on their fortitude and stated, "I sincerely feel it's the only verdict you could return and be fair to society." This statement does not

[1]On the basis of defendant's history, a personal interview with him, and a medical examination, each psychiatrist concluded that though defendant suffered from a sociopathic personality disorder, he was legally sane at the time of the killing. The only evidence that defendant did not know the nature and quality of his act or that it was wrong was a statement by defendant reported by two of the psychiatrists that when he strangled the victim he did not know what he was doing. Defendant told the third doctor, however, that he strangled her because he was angered by her refusal to kiss him.

[2]"A person is not criminally responsible for an act if, at the time of the commission of such act, as a substantial consequence of mental disorder, he did not have adequate capacity to conform his conduct to the requirements of the law which he is alleged to have violated." Special Commissions on Insanity and Criminal Offenders, First Report, July 7, 1962, State of California, Sacramento, California, pp. 15, 48.

show bias, but merely reflects an opinion formed by the court after hearing all the testimony and observing the witnesses. There is nothing in the comment to suggest that the judge was prejudiced against defendant or that his opinion was so firmly settled that he could not objectively reappraise the evidence. (Cf. *McEwen* v. *Occidental Life Ins. Co.*, 172 Cal. 6, 9-11 [155 P. 86].)

Defendant contends, however, that the court did not in fact review the evidence. After denying defendant's motion for new trial without comment, the court, in summarizing the proceedings before passing judgment, stated that the jury had found defendant guilty of murder in the first degree and that the court agreed with this finding. Thus the court indicated its independent approval of that verdict. The court, however, did not state its concurrence in the jury's finding that defendant was legally sane. Defendant points to this omission as evidence to support his claim that the trial court did not review the evidence relating to defendant's sanity.

The court's failure to state its agreement with the jury's finding was not sufficient to rebut the presumption that the court performed its duty. (Code Civ. Proc., § 1963, subd. 15; see *People* v. *Hooton*, 53 Cal.2d 85, 88 [346 P.2d 199].) Moreover, the only witnesses at the sanity trial, three court-appointed psychiatrists, unanimously agreed that defendant was legally sane. Two of the psychiatrists noted that defendant had stated to them that he did not know what he was doing when he strangled the victim, but defendant told the third doctor that he had strangled her because he was angered by her refusal to kiss him. It was probably because of the ample evidence of defendant's sanity that the court did not find it necessary to indicate its assent to the jury's verdict.

At the penalty trial the court instructed the jury that "In making your determination as to the penalty to be imposed, you may consider that the laws of California provide that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that a prisoner serving a life sentence may be paroled, but not until he has served at least seven years." In *People* v. *Morse*, 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33], we held such an instruction erroneous on the ground that the "function of the jury is to consider the facts surrounding the crime and defendant's background, and upon that basis, reach its decision. The jury should not be invited to decide if the defendant will be fit for release in the

future; it should not at all be involved in the issue of the time, if any, when the defendant should be released; it should not be propelled into weighing the possible consequences of the Authority's administrative action.'' We have no doubt in the present case that the error was prejudicial.

The jurors indicated that their decision on the penalty was dependent on their evaluation of ''the success of the Adult Authority in protecting society.'' After several hours of deliberation on the penalty, the jury returned to the courtroom to ask several questions[3] and also to request that Mr. Spangler, the administrative officer of the Adult Authority, be recalled. These questions and the request to recall Mr. Spangler demonstrate the jurors' concern with the possibility of defendant's being paroled if given a life sentence and with the likelihood of recidivism if he were paroled. The jury retired and returned somewhat later when, in response to an inquiry by the court, the foreman indicated that the jury was evenly divided and a verdict seemed ''unlikely.'' He explained the jury's difficulties in the following discussion with the court: ''MR. PEIRCE: . . . The reason we are requesting additional information is to help satisfy the concern of various people for various interests in the matter, the protection of society. THE COURT: I understand. MR. PEIRCE: Things of this nature ... it's a sort of technical type legal discussion thing. I would like to tell you a little further about—not about why the feelings exist, but about what kinds of concern are evidenced by members of the Jury on one side or the other and explain, if possible, why I and others feel that other information would be helpful in reaching a decision. THE COURT: All right, you may do so. MR. PEIRCE: One of the concerns that seems to be evidenced is what—well, one of the questions we asked was a statistical sort of a thing and the reason for that question was to determine further in our own minds what the qualifications were of the California Adult Authority in, let's say, what is the degree of success, its degree of success had been from a historical standpoint in protecting

---

[3](a) ''The first-degree murder, what percentages suffer sociopathic character?''

(b) ''First-degree murder, what percentage commit major crimes, meaning murder of the first or second degree or felonies after their first parole?''

(c) ''First-degree murderers suffering from sociopathic character, what percentage committed major crimes after their first parole?''

(d) ''What is the ratio of death penalties versus life imprisonment for first-degree murder convictions?''

society in similar circumstances as we are in here. THE COURT: Of course, the trouble is each case is very individual. You can't look in the book and come up with the answer. MR. PEIRCE: Well, suppose, for example, that crimes of similar nature had been committed in the past. We were wondering if information is available on what sort of chances for success, rehabilitation were evident from information about the behavior of people who have been in similar situations, in prison for a term and then released; information about the duration of confinement for persons convicted of similar crimes, the nature and extent of psychological help that might be available to them. In other words, what chances were offered, what facilities, what personnel were available for psychological assistance to a person in need of that? Let's see, some of the other kinds of things that were crossing our minds. I guess that expressed in general the type of information we thought would help us on reaching a conclusion about the—I guess I could say the success of the Adult Authority in protecting society, hopefully, once again, based on crimes of similar nature. THE COURT: I don't know what I can add to what I have already said. You haven't deliberated very long today, I will let you deliberate a little longer, then I will talk to you again.'' Three and one-half hours later the jury returned with its verdict.

It is clear from the foregoing discussion that the jury chose the death penalty because of its misgivings as to the success of the Adult Authority in protecting society and its qualifications to do so. A new trial on the issue of penalty is therefore necessary.

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Gibson, C. J., Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—I concur generally in the reasoning of the opinion authored by Mr. Justice Traynor; in the affirmance of the judgment in all respects other than as to penalty; and in the reversal of the judgment insofar as it relates to the penalty phase because of the instruction on possibility of parole and possibility of pardon or reduction of sentence by the Governor, the giving of which we held to be in error in *People* v. *Morse* (1964) 60 Cal.2d 631, 636 [1a]-653 [1d] [36 Cal.Rptr. 201, 388 P.2d 33]. However, in weighing the effect of that error (i.e., articulating the basis for our conclusion of

prejudice), Justice Traynor's opinion appears to stress only the fact that the jury interrupted their deliberations to ask several questions relating to the probability of defendant's being paroled and the likelihood of recidivism in such event. In concurring, I emphasize that the record before us also contains the two other elements accentuated in *Morse* (at pp. 652-653 [6a] of 60 Cal.2d) as contributing to the totality "of the entire cause" (Cal. Const., art VI, § 4½) upon which totality we found prejudicial effect of the error: i.e., (1) the fact that (as Justice Traynor impliedly recognizes by referring to the jury's request to "recall" the witness Spangler) a substantial mass of evidence was introduced as to the asserted statistical averages of prison terms actually served by persons sentenced to life imprisonment for first degree murder, and (2) the fact that the prosecutor (and likewise defense counsel) commented at length on this material in argument to the jury. I conclude that all of these elements (i.e., the totality "of the entire cause" as contemplated by the explicit mandate of our Constitution) combine to make it appear "reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error." (*People* v. *Morse* (1964) *supra,* 60 Cal.2d 631, 653 [6a]; *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [12] - 838 [13] [299 P.2d 243].)

McCOMB, J., Concurring and Dissenting—I would affirm the judgment in its entirety. (See my concurring and dissenting opinion in *People* v. *Hines, post,* p. 182 [37 Cal.Rptr. 622, 390 P.2d 398].)

Respondent's petition for a rehearing was denied April 15, 1964. McComb, J., was of the opinion that the petition should be granted.