[Crim. No. 7373.   In Bank.   March 20, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. WALTER CLAYTON HINES, Defendant and Appellant.

John H. Sutter, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

TOBRINER, J.—In this capital case, in which defendant entered a plea of guilty of murder in the first degree and in which the jury fixed the penalty at death, we reverse the judgment insofar as it relates to the penalty. The instructions and the prosecutor's argument in the penalty trial gave rise to the errors which we condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]; these errors, we find, were substantial. Because of the nature of the penalty trial, any substantial error, as we explain, causes prejudice. We reject, however, defendant's contention that he suffered denial of both his right to a trial on the sanity issue and to a public trial. Nor do we sustain defendant's contentions as to errors in the instructions, although we agree with his position that the tape recordings of his confession, which included his account of prior crimes, should not have been admitted in their unexpurgated state.

Defendant was accused by information, filed in the Superior Court of Los Angeles County, of the murder of one Billy Cooper. Defendant entered pleas of not guilty and not guilty by reason of insanity. After two continuances and a waiver of defendant's right to be tried within 60 days, defendant withdrew his pleas of not guilty and not guilty by reason of insanity, entering a plea of guilty of murder in the first degree. Thereafter the jury fixed the penalty at death.

On July 1, 1962, defendant attempted the robbery of a liquor store in Venice. He entered the store, ordered a pack of cigarettes, took out his pistol, and said "This is a stick up." Cooper, the attendant, tried to press the alarm button; defendant told him not to do so. "So then he decided, well, he was going to try, you know, to shoot me down, I guess, so he walked around the cigar section and reached for his gun, and when I saw the gun, you know, what could I do, man, so that was it." Cooper got the gun, fired at defendant but

missed him; defendant shot Cooper in the forehead; the victim fell behind the counter, and defendant reached over and fired three or four more shots into the body to make sure that Cooper was dead.

Defendant later confessed that he killed Cooper in order to avoid identification; that he entered the store for the purpose of robbing it and killing whoever was there; that he would have killed Cooper whether or not he resisted. After shooting Cooper, defendant panicked, took only a pack of cigarettes, and left the store.

As respondent states, ''[E]fforts to find the killer proved unavailing until the afternoon of July 11 when appellant walked into the Venice division police station,'' and confessed the crime. He removed from a brown paper bag an automatic pistol which the parties at the trial stipulated was the murder weapon.

We discuss four aspects of the case: first, the errors committed in the penalty trial; second, defendant's contention that he was deprived of a trial on the issue of sanity; third, defendant's argument that he was denied a public trial in violation of his constitutional rights; fourth, alleged errors in the rendition of instructions and in the admission of evidence at the penalty trial.

Turning to the penalty trial, we note that the court gave the exact instruction that we held constituted error in *Morse*.[1] Furthermore, the prosecutor in his closing argument stressed that the only way the jury could be assured that defendant would not ''be again on the streets of this community,'' would be to return the death penalty. He also argued that ''we assume that those persons responsible for paroling individuals do so conscientiously, but all human beings are fallible.'' On the point of the improper diminution of the responsibility of the jury, the prosecutor argued that ''neither would the return of the death penalty necessarily

---

[1]The trial court instructed the jury that ''Every person guilty of first degree murder shall suffer death or confinement in the State Prison for life in the sole discretion of the jury. . . . In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this State provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that if this defendant is sentenced to life imprisonment he may be eligible for parole at the expiration of seven calendar years. A trial judge may also reduce the penalty from death to life imprisonment.'' (CALJIC No. 306 (rev.).)

mean the death penalty. Regardless of what sentence you impose upon the defendant, be it life imprisonment or death, the Governor of this state has the power to pardon him, to commute his sentence, be it death, to life imprisonment''; and his last statement to the jury was, ''Please listen to the Judge's instructions carefully, with reference to what life imprisonment means, and the fact that death does not necessarily mean death. . . .''

The instructions and statements constituted error. They improperly ''diverted the jury's attention from its own task of decision to the roles of the Governor, the Legislature and the Adult Authority, as well as to possibilities of reduction of the sentence by their action.'' (*People* v. *Terry* (1964) *ante*, p. 137 at p. 141 [37 Cal.Rptr. 605, 390 P.2d 381].)

We must determine, then, whether under article VI, section 4½, of the California Constitution the error resulted in a miscarriage of justice.[2] We apply the recognized test that ''a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'' (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In applying this test to a death penalty case we must recognize the deep-founded difference between the task of the jury in the penalty trial and its ''usual function of finding whether or not certain events occurred and certain consequences resulted from them.'' (*People* v. *Morse* (1964) 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33].) In all other situations than the penalty trial the jury deliberates under the court's instructions and reaches its verdict within the area delineated by the judge. In the penalty phase the court gives no such instructions; ''the jury must decide [this] question without benefit of guideposts, standards or applicable criteria.'' (*People* v. *Terry* (1964) *ante*, at p. 154 [37 Cal. Rptr. 605, 390 P.2d 381].) The jury decides in its absolute and unguided discretion whether to exact the death penalty. In

[2]Article VI, section 4½, reads as follows: ''No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.''

all other situations than the penalty trial the evidence must be narrowed down to the point at issue; in the penalty trial the evidence consists of a multitude of matters pertaining to the defendant (see *People* v. *Friend* (1957) 47 Cal.2d 749, 767 [306 P.2d 463]) enabling the jury to make ''a complete and careful analysis of that person as a human composite of emotional, psychological and genetic factors'' (*People* v. *Morse, supra,* 60 Cal.2d at p. 647.)

The isolation of the determination of the death penalty in the penalty trial, which proceeds without standards for the jury, plus the expansion of the subject-matter of the trial, which has reached very wide margins, gives to the jury an undefined task performed upon a showing of a mass of material. As a result the jury may conceivably rest the death penalty upon any piece of introduced data or any one factor in this welter of matter. The precise point which prompts the penalty in the mind of any one juror is not known to us and may not even be known to him. Yet this dark ignorance must be compounded 12 times and deepened even further by the recognition that any particular factor may influence any two jurors in precisely the opposite manner.

We cannot determine if *other* evidence before the jury would neutralize the impact of an error and uphold a verdict. Such factors as the grotesque nature of the crime, the certainty of guilt, or the arrogant behavior of the defendant may conceivably have assured the death penalty despite any error. Yet who can say that these very factors might not have demonstrated to a particular juror that a defendant, although legally sane, acted under the demands of some inner compulsion and should not die? We are unable to ascertain whether an error which is not purely insubstantial would cause a different result; we lack the criteria for objective judgment.

Thus *any* such substantial error in the penalty trial may have affected the result; it is ''reasonably probable'' that in the absence of such error ''a result more favorable to the appealing party would have been reached.'' Indeed, in thus defining the prejudicial consequence of error in the penalty trial we do no more than reiterate the rule of *People* v. *Hamilton* (1963) 60 Cal.2d 105, 136-137 [32 Cal.Rptr. 4, 383 P.2d 412]. In that case, after enumerating the tests of prejudicial error in the guilt phase, Justice Peters, writing for the court, said, ''[I]t necessarily follows that any substantial error occurring during the penalty phase of the trial, that results in

the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial. This rule of law has been hinted at, if not decided, in prior cases. In *People* v. *Linden* (1959) 52 Cal.2d 1, 27 [338 P.2d 397], it was said that error and misconduct in the penalty trial 'implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision [art. VI, § 4½] save the verdict.' '' (P. 137.) (See also *People* v. *Love* (1960) 53 Cal.2d 843, 857 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Terry* (1962) 57 Cal.2d 538, 569 [21 Cal. Rptr. 185, 370 P.2d 985]; *Pait* v. *State* (Fla. 1959) 112 So.2d 380, 385.)

In characterizing the wide latitude and the loose function of the jury in the penalty trial, we said in *People* v. *Terry* (1964) *ante*, p. 154 [37 Cal.Rptr. 605, 390 P.2d 381], "To attempt to assess the effect of error in this legal vacuum is to superimpose one untestable surmise upon another. We must not pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses. Hence we must conclude that in view of the nature of this kind of trial, the above errors *necessarily* caused prejudice." (Italics added.)

Our sole inquiry here devolves into a determination of whether substantial error, that is, substantial deviation from the standards established in *Morse*, has occurred. We have set forth above the incidents of the errors under the *Morse* test. That the deviations were substantial cannot be seriously questioned. We therefore hold that prejudicial error occurred in the instant penalty trial.

Defendant's second contention, that he was deprived of a trial on the issue of sanity, succumbs to his waiver of the issue. Although the record shows some possible confusion as to this matter, defendant specifically waived the sanity defense, and, in addition, his counsel's subsequent conduct in acquiescing in a procedure that necessarily rested upon such waiver corroborated it. Under such circumstances we cannot expect that a heavily burdened trial court should itself preserve an issue which is so lightly treated by the party himself.

The origin of the difficulty lies in the preliminary statement of defense counsel. Defendant initially entered pleas of not guilty and not guilty by reason of insanity, but, after the selection of the jury, defense counsel stated: "Mr. Crigger [deputy public defender]: At this time, your Honor, it is the desire of the defendant to withdraw his plea of not

guilty, and enter a plea of guilty as charged, and the other issue of not guilty by reason of insanity we would be willing to submit the matter to the Court or the jury on that particular issue, and submit it on the doctors' reports, if that is satisfactory to the People.''

The following colloquy then occurred: ''THE COURT: You want to waive your plea of not guilty? MR. CRIGGER: Yes. So that the only remaining issue for the jury would be the penalty issue. . . .THE COURT: Then, what about the insanity issue? MR. LIGHT [deputy district attorney]: That is being waived. MR. CRIGGER. Yes. We will waive a jury trial.

The trial court explained to defendant the effect of a plea of guilty and asked him if he wanted to change his plea. Upon receiving an affirmative answer, the court accepted the change. The following proceedings then occurred: ''MR. LIGHT: Mr. Hines, in Superior Court Information No. 261235, on which you have heretofore been arraigned and entered a plea of not guilty, and also not guilty by reason of insanity, your counsel has informed the Court that you desire to withdraw that, *both of those pleas,* is that right, sir? THE DEFENDANT: *That's correct.* MR. LIGHT: And you are doing this freely and voluntarily? THE DEFENDANT: Yes. MR. LIGHT: And I understand further, that it is your intention to enter a plea of guilty to the Information, as charged, to wit, alleging that you committed murder in violation of section 187 of the Penal Code, is that right? THE DEFENDANT: That's correct. . . . MR. LIGHT: . . . Mr. Hines, as to the charge in Superior Court Information No. 261235, how do you plead, guilty or not guilty? THE DEFENDANT: Guilty. . . . THE COURT: Very well. *Then the only procedure will be to present to this jury . . . the issue of punishment. . . .*'' (Italics added.)

Although defendant argues that he did not intelligently waive *both* pleas but merely intended to follow his counsel's statement that he withdraw the guilty plea and waive a jury trial on the sanity issue, the record shows his specific agreement to retract both pleas. Moreover, the trial court repeatedly indicated its understanding that the only remaining issue involved the penalty and that this issue was to be submitted to the jury. Not only did defendant's counsel fail to disagree or object to the ongoing process of the trial, but when, immediately before reconvening court for commencement of the penalty trial, the trial court asked, ''Anything else that occurs to you?'' defendant's counsel answered ''No.''

Indeed the subsequent proceeding of the penalty trial it-

self was predicated upon a finding that defendant was guilty of the charged offense and a finding that "on any plea of not guilty by reason of insanity" defendant was sane.[3] In permitting the court, without objection, to proceed with the penalty trial on the assumption that any such plea had been withdrawn, the conduct of defendant's counsel confirmed the fact of defendant's waiver. (See *People* v. *Gaines* (1962) 58 Cal.2d 630, 636 [25 Cal.Rptr. 448, 375 P.2d 296].)

■ We find no merit in defendant's third argument, that he suffered a violation of constitutional right in that the court removed to its chambers the proceedings upon defendant's motion to withdraw his pleas and to enter a new plea. The cases do not require that defendant must personally waive a public trial in order to establish the propriety of such proceedings; the hearing of the motion in chambers does not, in the absence of an objection, constitute an improper denial of a public trial. "[I]t has long been held that the right to public trial may be waived without the expressed consent of either defendant or his counsel. ..." (*People* v. *Cash* (1959) 52 Cal.2d 841 [345 P.2d 462].)

The cases cited by defendant do not affect this holding. The presentation of defendant's objection in both *People* v. *Hartman* (1894) 103 Cal. 242 [37 P. 153, 42 Am.St.Rep. 108] and *People* v. *Byrnes* (1948) 84 Cal.App.2d 72 [190 P.2d 290], distinguishes those cases from the present one. The requirement of the federal law that a defendant must personally waive the right to public trial, in contrast to the rule in this state, renders inapplicable *Garcia* v. *Sanford* (D.C. N.D. Ga. 1945) 62 F.Supp. 658. Likewise, the cited case of *Hopt* v. *Utah* (1883) 110 U.S. 574 [4 S.Ct. 202, 28 L.Ed. 262], which held that a defendant could not waive his right to be present at a hearing on challenges of proposed jurors, obviously does not apply here.

Defendant's fourth contention relates to alleged prejudicial errors in the court's failure to render certain instructions and its permission to introduce certain evidence. We proceed to explain, first, why we have found no merit in

---

[3]Section 190.1 of the Penal Code reads, in part: "The guilt or innocence of every person charged with an offense for which the penalty is in the alternative death or imprisonment for life shall first be determined, without a finding as to penalty. If such person has been found guilty of an offense punishable by life imprisonment or death, and has been found sane on any plea of not guilty by reason of insanity, there shall thereupon be further proceedings on the issue of penalty. ..."

defendant's claim that the court improperly refused to give defendant's proffered instructions.

Defendant contends that the court erred in not instructing the jury that in case of reasonable doubt the lesser penalty should be exacted and that aggravating or mitigating circumstances must be proved by a preponderance of the evidence. Yet, as defendant himself recognizes, the decisions clearly hold that such instructions erroneously limit the jury's absolute discretion in the selection of a penalty, and we see no reason to change the established rule. (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 134 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Howk* (1961) 56 Cal.2d 687, 697 et seq. [16 Cal.Rptr. 370, 365 P.2d 426].)

Nor did the court err in failing to instruct upon its own motion that the jury should view with caution oral admissions of defendant. The rule advocated by defendant, found in section 2061, subdivision 4, of the Code of Civil Procedure, has been held to be inapplicable to tape-recorded statements, which is the type of admission presented here. (*People* v. *Gardner* (1961) 195 Cal.App.2d 829, 832 et seq. [16 Cal.Rptr. 256].)

As to the admission of testimony, we find no error in two of the three instances of which defendant complains, but we believe error did occur in the third.

Defendant objected to the admission of the testimony of one psychiatrist that "... there [was] a good possibility that he [defendant] might [commit the same offense again], if circumstances were right," and to the similar testimony of another psychiatrist. Defendant raised no objection to the testimony at the trial level. We believe *People* v. *Bickley* (1962) 57 Cal.2d 788 [22 Cal.Rptr. 340, 372 P.2d 100], completely disposes of the contention: "Such evidence obviously related to appellant's mental condition and was admissible." (P. 793.)

Defendant's second claim that the introduction of allegedly "gruesome photographs" of the deceased worked error, since their probably prejudicial effect outweighed their probative value, cannot stand in the absence of defendant's counsel's objection to their admission. Since the penalty phase of this case must be retried, however, we take this occasion to express our difficulty in finding such photographs relevant. In view of the fact that defendant admitted his guilt and described the circumstances of the crime, we see no probative value in the photographs which would outweigh

their prejudicial effect. (*People* v. *Love* (1960) 53 Cal.2d 843, 854-857 [3 Cal.Rptr. 665, 350 P.2d 705].)

We have concluded, however, that the trial court erroneously allowed the jury to hear tape recordings of defendant's confession without erasing, or otherwise deleting, the portions of the tape in which defendant mentioned prior criminal offenses involving narcotics violations and a purse snatching. In view of *People* v. *Hamilton* (1963) 60 Cal.2d 105, 129, 131 [32 Cal.Rptr. 4, 383 P.2d 412], the extrajudicial admissions of prior offenses should not have been admitted in the absence of corroborating evidence. This court in *Hamilton*, upon a thorough examination of the issue, held that the same standards of competency of evidence apply to the penalty trial as to the guilt trial; extrajudicial admissions of a defendant are not admissible "without proof *aliunde* that such a crime had been committed." (P. 129.) (See also *People* v. *Terry* (1964) *ante*, p. 137 [37 Cal.Rptr. 605, 390 P.2d 381].)

According to the prosecution, even though defendant's statements do contain admissions of criminal conduct, they should be admitted because they show "his attitude toward society and his outlook on life"; in support of this proposition the People cite *People* v. *Linden* (1959) 52 Cal.2d 1, 20 [338 P.2d 397]. Yet, as we shall explain, *Linden* does not so hold.

In the first place, *Linden* involves the relevancy and not the competency of the evidence; the case does not touch upon the requirement for corroboration of the extrajudicial statement. In the second place, defendant's allusion to his criminal record in *Linden* was inextricably bound into his expression of his contempt for the process of law enforcement: the officer testified that defendant boasted "that he was very tough to beat, and that he had beaten one other murder rap." (P. 20.) Thus the *Linden* court explains that "defendant's admissions concerning his criminal record were provable as necessary, *inseparable* parts of relevant admissions as to his attitude toward police officers and toward accusations of crime. ..." (P. 20; italics added.) In contrast, the remarks of defendant in the instant case as to other crimes could have been severed from the balance; the statements in themselves possessed no probative value other than disclosure of the fact of defendant's commission of other crimes.

Respondent finally attempts to sustain the trial court's

position by arguing that defendant waived his objection in not requesting a suggested limiting instruction and by relying upon *People* v. *Weitz* (1954) 42 Cal.2d 338, 347 [267 P.2d 295]. That case does not hold, however, that the failure to request the limiting instruction forecloses the point upon appeal; indeed, it dealt with evidence clearly admissible for a limited purpose and with defendant's failure to request an instruction to narrow its consideration to that relevant object. Here we pass upon incompetent evidence not admissible in the first place.

The judgment is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Gibson, C. J., Traynor, J., Peters, J., and Peek, J., concurred.

SCHAUER, J., Concurring and Dissenting.—I concur in the affirmance of the judgment in all respects other than as to penalty, but I must dissent from the reversal on the penalty phase.

In *People* v. *Morse* (1964) 60 Cal.2d 631, 636 [1a]-653 [1d] [36 Cal.Rptr. 201, 388 P.2d 33], we held it error to give the theretofore accepted instruction (CALJIC No. 306 rev.) on possibility of parole, pardon, or reduction of sentence by the Governor or the trial court. Obedient to the mandate of article VI, section 4½, of the California Constitution,[1] we then made "an examination of the entire cause, including the evidence," in order to determine whether that error, on the totality of the record of that case, resulted in a miscarriage of justice. Our reasoning and conclusion were as follows (*id.* at pp. 652-653 [6a] of 60 Cal.2d) :

"We *have no doubt* that these errors in directing the attention of the jury to the roles of Adult Authority, judge and Governor, by means of argument, evidence and instruction in the instant case, prejudicially influenced the jury. Moreover, after deliberating for one day, the jury specifically asked 'to hear again the court's instructions re the third phase, in clarification of reference to possible consequences.'

---

[1]Article VI, section 4½, reads as follows: "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The court then reread the above-mentioned instruction. The jury then asked additional questions relating to the alternative death or life sentences. Thus the jury, while deliberating upon the death penalty, was aware of, and had repeated to it, the facts concerning the roles of the Adult Authority, the trial judge and the Governor. Furthermore, the trial court affirmatively instructed the jury that it could consider these facts. Whatever the reasons this court might have found in the record in *Linden* 'to avoid an otherwise indicated reversal,' we find *in the record here* no justification for concluding that the error was not prejudicial insofar as concerns the fixing of penalty. To the contrary, *after examination of the entire cause, including the evidence, we are of the opinion that it is reasonably probable that a result more favorable to defendant as to penalty would have been reached in the absence of the error.*" (Italics added.) The emphasized language of the last quoted sentence is that of this court's well-settled interpretation of the mandate of our Constitution (art. VI, § 4½) as enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [12] [299 P.2d 243].

There was—and is—no ambiguity in the just quoted reasoning and conclusion of *Morse*, and I concurred on the understanding that the opinion meant what it said in analyzing the various factual elements "in the record here" and in applying thereto the express language of the *Watson* test. (See also my concurring opinion in *People* v. *Quicke* (1964) *ante*, p. 162 [37 Cal.Rptr. 617, 390 P.2d 393].) Obviously we found that the evidence which we are required to consider (the totality of the record including the evidence) *at least* preponderated in establishing that there had been a miscarriage of justice. Indeed, we said "We have no doubt" as to the effect of the error.

In the case at bench, after holding erroneous the same instruction as that condemned in *Morse*, the majority properly continue (*ante*, p. 168): "We must determine, then, whether under article VI, section 4½, of the California Constitution the error resulted in a miscarriage of justice. [Fn. omitted.] We apply the recognized test that 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)"

Yet it appears to me that the majority thereafter pay no

more than lip service to either the constitutional mandate or "the recognized test" formulated in *Watson*. The majority first argue (*ante*, p. 169) that "any substantial error" occurring on the penalty phase "*may* have affected the result" (italics added). This *may* be true; but having said it, we are not further advanced. The same, after all, can properly be said of any substantial error in the guilt phase: it too "may have affected the result." But whether it simply *may* have done so is not the issue before us as an appellate court: Here, we are called upon to discharge our constitutional obligation and either affirm the trial court's judgment or affirmatively determine "after an examination of the entire cause, including the evidence" that in our opinion the error *has resulted* in a miscarriage of justice; if we do not reach that affirmative conclusion we cannot reverse the judgment without clear violation of the Constitution's express mandate.

Having nevertheless asserted that any substantial error "may have affected the result," the majority then purport to apply the *Watson* test, saying (*ante*, p. 169): "it is 'reasonably probable' that in the absence of such error 'a result more favorable to the appealing party would have been reached.'" But how can it be reasonably "probable" that a different result would have been reached if the error is simply one which "may have" affected—rather than probably did affect—the result? To say that an error "may have" affected the result is to say only that it *possibly* did so; this is the language of mere speculation. Indeed, such is the majority's position: i.e., that because of the asserted absence of standards and the wide scope of admissible evidence in this phase of the trial, "the jury may conceivably rest the death penalty upon any piece of introduced data or any one factor in this welter of matter. The precise point which prompts the penalty in the mind of any one juror *is not known to us* and may not even be known to him." (Italics added.) (*Ante*, p. 169.) That quoted language of the majority in truth precludes reversal of the judgment; it demonstrates that they cannot, on the totality of the record, rationally reach through a *preponderance of proof* an affirmative opinion that a result more favorable to the defendant probably would have been reached in the absence of the error complained of. In such circumstances it is of course *possible* that a substantial error "may have affected the result." Yet it is equally possible that it may *not* have done so: as the majority subsequently—and commendably—acknowledge (*ibid.*), "Such factors as the grotesque nature of the crime, the certainty of guilt, or the

arrogant behavior of the defendant may conceivably have assured the death penalty *despite any error."* (Italics added.) The very recitation of the quoted statement demonstrates that the majority's ultimate conclusion is constitutionally untenable—and it does not question the fact of guilt.

To jump from the premise that a given error *possibly* (i.e., "may have") affected the result, to the conclusion that "it is reasonably *probable* that" in the absence of such error a result more favorable to defendant "would have been reached" is not logic. We spoke plainly in *Watson,* and there is no mystery about what we meant when we used the word "probable" in the subject formulation: In this as in other uses in the law (e.g., "probable cause"), the word has its commonsense meaning of "more than a mere possibility, and more than mere conjecture." (72 C.J.S. 969; *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [12] [299 P.2d 243] ["[T]he test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated"]; see also California Words, Phrases and Maxims, p. 441 and cases there cited.) Manifestly, "probability" and "possibility" are not synonyms for meeting the explicitly defined constitutional standard. It cannot be seriously argued that the requirement for an affirmative finding of *probable* prejudice is satisfied by a finding of *possible* prejudice. In other words, this court cannot unequivocally *"be of the opinion* that the error complained of *has resulted* in a miscarriage of justice" (italics added) when by its own language it finds only a *possibility* that there has been such a miscarriage. Once again, the language of the majority is that of mere speculation—not the substantial preponderance of evidential proof required by section 4½.

In our work we should assume that the vast majority of the people of California are law-abiding persons of good conscience and good will. It requires no extrasensory perception to know that they want—and they deserve—at least reasonably firm and sustained law enforcement. They do not, I think, object to the law's being sometimes tempered with mercy; but that is a function of the trial court or of the Executive, not of this reviewing court. Section 4, article VI, of our Constitution expressly provides that "The Supreme Court shall have appellate jurisdiction ... *on questions of*

*law* alone, in all criminal cases where judgment of death has been rendered.'' (Italics added.) The foregoing language is that of limitation, as well as a grant, of power. The people, by sections 4 and 4½, evidence the fact that they do not want law enforcement to be substantially weakened, and sociopathic criminals correspondingly encouraged, by judicial innovations of technical (not concerned with guilt or innocence) grounds for reversals of judgments imposing the most feared penalty for those crimes which the Legislature has determined need most to be deterred. That great majority of our body politic are entitled to such consistently firm law enforcement as will at least tend to make them reasonably safe in their homes and places of business, and on the streets in going to and from those places.

We cannot doubt that we do not have satisfactory safety for law-abiding citizens today. That fact is concomitant with the fact that the percentage of death penalty judgments which have been reversed for declared procedural errors during the past five years is a sorry one. It was such a situation in the period preceding October 10, 1911, that led to the adoption by an aroused electorate of section 4½, article VI, of our Constitution (then made applicable only to criminal trials but later extended to civil cases). I think it is not reasonably to be expected that the current conditions of increasing crimes of violence will be ameliorated by today's virtual abrogation, as to the penalty phase, of the mandate of article VI, section 4½, as we explained it in *Watson*. Under the majority's ''interpretation'' of that mandate (see also *People* v. *Hamilton* (1963) 60 Cal.2d 105, 136 [27]-137 [28] [32 Cal.Rptr. 4, 383 P.2d 412]) any ''substantial'' error ''must be deemed to have been prejudicial.'' (*Ante*, pp. 169-170.) But it is exactly such ''deemed''or ''presumed'' prejudice that article VI, section 4½, was adopted by the people to prevent. (See *People* v. *Watson* (1956) *supra*, 46 Cal.2d 818, 834-835 [11], and cases there cited.) It is no answer to say that prejudice must be ''presumed'' from such error on the penalty phase because the jury is assertedly vested with an ''absolute and unguided discretion'' in fixing the penalty (*ante*, p· 168). The majority do not discuss (or even mention) the fact that at the time article VI, section 4½, was adopted juries also possessed such discretion.[2]

---

[2]Since the 1874 Penal Code section 190 has provided that ''Every person guilty of murder in the first degree shall suffer death, or confine-

Nor is it any answer to point to the enactment of Penal Code section 190.1 in 1957, whereby the Legislature sanctioned broad inquiry into "the defendant's background and history, and ... any facts in aggravation or mitigation of the penalty. ..." To begin with, that enactment could not have the effect of abrogating *pro tanto* article VI, section 4½, of our Constitution, for the obvious reason that the Legislature has no power to thus nullify a constitutional command. Moreover, the primary emphasis of the majority here is on the so-called "legal vacuum" in which the jury assertedly operate (*ante*, p. 170); but in that respect, as noted above, the discretion vested in the jury was no less "absolute" at the time article VI, section 4½, was adopted than it is today. Then as now an appellate court could not know "The precise point which prompts the [death] penalty in the mind of any one juror"; then as now it could be said that "any particular factor" might "influence any two jurors in precisely the opposite manner." (*Ante*, p. 169.) Yet in adopting the constitutional mandate the people made no express or implied exception for the issue of penalty in a trial for first degree murder, but declared absolutely that "*No judgment* shall be set aside, or new trial granted, *in any case,*" unless its terms be complied with.[3] (Italics added.)

The most devastating blow to article VI, section 4½, as it applies to the penalty phase, is struck by the majority's definition of that "substantial error" which is "deemed to have been prejudicial." Instead of applying the constitutional test to determine whether any given error was "substantial" in that sense, the majority assert (*ante*, p. 170):

---

ment in the State Prison for life, *at the discretion of the jury*" (italics added.) (See also *People* v. *Spencer* (1963) 60 Cal.2d 64, 75 fn. 3 [31 Cal.Rptr. 782, 383 P.2d 134].)

[3]That a related constitutional provision applies alike to issues of punishment as well as guilt has been recognized by this court: "There is no justification for holding that a judge has a lesser right to comment on the evidence where punishment is involved than where matters relating to guilt are in issue, and the same principles should be applied in determining whether the power [conferred by section 19 of article VI] has been properly exercised. ... It is true that the jury has exclusive discretion as to the punishment to be imposed, but no distinction can be made on this ground since the jury is also the exclusive judge of all questions of fact relating to guilt. In short, regardless of which issue is being tried, the respective functions of judge and jury as to factual questions are the same, and neither the language of the constitutional amendment nor the purpose underlying its adoption permits the imposition of different limitations on the power to comment on the evidence." (*People* v. *Friend* (1958) 50 Cal.2d 570, 579 [7] [327 P.2d 97].)

"Our sole inquiry here devolves into a determination of whether substantial error, *that is, substantial deviation from the standards established in Morse*, has occurred. We have set forth above the incidents of the errors under the *Morse* test. That the deviations were substantial cannot be seriously questioned. We therefore hold that prejudicial error occurred in the instant penalty trial.'' (Italics added.) Since the instruction condemned in *Morse* was commonly given (with the approval of this court) in all capital murder trials (over a period of years) before the *Morse* opinion was handed down, it follows from the emphasized language of the majority opinion that in *all* cases of that nature there has been ''substantial deviation from the standards established in Morse,'' and hence that the giving of such instruction will hereafter ''be deemed to have been prejudicial'' in those cases. Today's decision appears to suggest that the majority will ''apply'' article VI, section 4½, in cases where that application tenably leads to a reversal (e.g., *Morse* and *People* v. *Quick*e (1964) *supra*), but will reach the same result in all other related cases—regardless of what may be revealed by ''an examination of the entire cause, including the evidence''—by the simple expedient of invoking the *Hamilton* language and ''deeming'' prejudicial the bare giving of the instruction itself.

The mandate of section 4½, article VI, is clear and is unequivocally recognized by this court in *People* v. *Watson* (1956) *supra*, 46 Cal.2d 818, 836-837 [12]; likewise clear is the limitation of section 4 on our powers of review to ''questions of law alone, in all criminal cases where judgment of death has been rendered.'' These are not just statutes; these are constitutional bulwarks. By these sections the people, properly concerned for their own (and loved ones') safety, have demonstrated that a judgment of death, once rendered, is not lightly to be set aside. Mere speculation that judicially declared procedural error *may* have contributed to the verdict is not a basis upon which we can lawfully disturb a judgment of death. The verdict is not ours; it is that of the jury. And the judgment is that of the trial court duly rendered pursuant to the verdict. We have neither right nor power to reverse that judgment unless the evidence before us (the totality of the record) establishes not only error but the probability—i.e., preponderates in showing—that a result more favorable to defendant would have been reached in the absence of the error,

It bears repeating that in *Watson* we said ''[T]he test, as stated in any of the several ways, must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated.'' (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [12] [299 P.2d 243].) Today, in the case at bench, it appears to me that by the majority's ruling ''the entire purpose of the constitutional provision [is] defeated.''

I have made ''an examination of the entire cause, including the evidence'' in this case, and I find herein no such concatenation of factual elements as warranted our conclusions of prejudice in *Morse* and *Quicke.* The record here simply does not support an affirmative finding that in the absence of the subject errors a result more favorable to defendant would have been probable. Accordingly, I would affirm the judgment in its entirety.

McCOMB, J.—I concur in the views expressed by Mr. Justice Schauer relative to the applicability of article VI, section 4½, of the California Constitution.

McCOMB, J., Concurring and Dissenting.—This court held in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], that it is no longer proper for the trial court to instruct the jury, or for the prosecution to argue to the jury, that a defendant sentenced to life imprisonment may be eligible for parole at the expiration of seven years. Because of that holding and my conviction that the law as established by the decisions of this court must ordinarily be followed, I feel obliged to concur in the holding that the instruction and argument here under consideration were erroneous.

However, under the decisions of this court, it was settled prior to our holding in *Morse* that such an instruction and argument were proper, and, in my opinion, under the doctrine of stare decisis this court should have continued to so hold. Accordingly, I dissented in *Morse* to reversal of the judgment insofar as it related to the penalty.

The doctrine of stare decisis is recognized by the Code of Civil Procedure, which states, in the title dealing with the kinds and degrees of evidence, that the law ''collected'' from the reports of decisions of the courts is unwritten law, as distinguished from that which is formally promulgated and recorded, and that such law, although it has no certain repository, should be observed and administered in the courts of this state. (Cf. Code Civ. Proc., § 1899.)

The doctrine of stare decisis is directed toward harmony. If a decision has been made on solemn argument and mature deliberation, the presumption is in favor of its correctness. The community has a right to regard it as a just declaration or exposition of the law and to regulate its actions and conduct by it.

It would be extremely inconvenient to the public if the precedents of the decided cases were not duly regarded and followed.

It is by the notoriety and stability of such rules that lawyers can safely give advice to those who consult them and that the public in general can venture with confidence to deal with each other.

When a rule has once been deliberately adopted and declared, it should not be disturbed unless by a reviewing court for cogent reasons and on a clear manifestation of error in the prior decisions. A contrary practice creates a state of perplexing uncertainty.

Mr. Justice Field expressed the foregoing views, as follows, in *Ex parte Newman*, 9 Cal. 502, 526: ''The law is a science, whose leading principles are settled. They are not to be opened for discussion upon the elevation to the bench of every new Judge, however subtle his intellect, or profound his learning, or logical his reasoning. Upon their stability men rest their property, make their contracts, assert their rights, and claim protection. It is true that the law is founded upon reason, but by this is meant that it is the result of the general intelligence, learning, and experience of mankind through a long succession of years, and not of the individual reasoning of one or of several judges. 'Reason,' says Lord Coke, 'is the life of the law, nay, the common law itself is nothing else but reason, which is to be understood of an artificial perfection of reason, gotten by long study, observation, and experience, and not of every man's natural reason.' It is possible that some intellects may rise to the perception of absolute truth, and be justified in questioning the general judgment of the learned of mankind. But before the legitimate and just inference arising from the general acquiescence of the learned can be avoided, the error in the principles recognized should be clearly shown. We should not blindly adhere to precedents, nor should we more blindly abandon them as guides.''

In holding that it is reversible error to instruct the jury that life imprisonment can mean parole after seven years,

this court in *People* v. *Morse, supra,* 60 Cal.2d 631, overruled, to the extent they conflict with the rule there announced, 22 prior decisions of this court. (*People* v. *Morse, supra,* at pp. 648-649 [1c].)

For example, this court held in *People* v. *Scott* (Spence, J.) 53 Cal.2d 558, 566 [8] [2 Cal.Rptr. 274, 348 P.2d 882]: ". . . He [defendant] contended that the trial court had erred in instructing the jury on the penalty phase of the trial that 'a defendant serving a life sentence may be paroled but not until he has served the minimum number of years as determined by law.' . . . It has been repeatedly held in this state . . . that substantially similar instructions may properly be given to the jury."

In *People* v. *Jones* (Peters, J.) 52 Cal.2d 636, 650 [8] [343 P.2d 577], we said: "Jones' newly appointed counsel argues that it was error for the prosecuting attorney to argue that life imprisonment, if imposed, would actually mean less than life. Although there is out-of-state authority to the contrary, the rule in this state is that such argument, or even an instruction to that effect, is proper."

In *People* v. *Barclay* (Traynor, J.) 40 Cal.2d 146, 158. [18] [252 P.2d 321], we held: "To aid the jury in fixing the punishment of the defendant . . . the court may instruct the jury as to the consequences of the different penalties that may be imposed so that an intelligent decision may be made."

In addition, we said in *People* v. *Ashley* (Peters, J.) 59 Cal.2d 339, 365 [29 Cal.Rptr. 16, 379 P.2d 496]: "All that the argument stated was that defendant, as a life termer, would be eligible for parole, and, presumably, at some indefinite time in the future might be paroled. This falls within the proper scope of argument."

In my opinion, the rule was so thoroughly established that it was improper for this court to change it under the circumstances.

Nevertheless, even though under the rule laid down in *Morse* we should hold that the instruction and argument in the present case were erroneous, the error was not, in my opinion, prejudicial, and under article VI, section 4½, of the California Constitution the alleged error should be disregarded because it does not affirmatively appear that a different verdict would have been reached had the instruction and argument been omitted.

Article VI, section 4½, of the California Constitution reads, in part: "No judgment shall be set aside . . . in any

case, *on the ground of misdirection of the jury* ... or for any error as to any matter of procedure, *unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.*" (Italics added.)

Finally, it is my opinion that we should retain the segregation of the governmental powers into the three branches as established by the California Constitution, to wit, legislative, executive, and judicial. (Cal. Const., art. III, § 1.)

The people of the State of California, through the legislative branch of the government, have declined to eliminate the death penalty. Yet, it would appear that the will of the people, as expressed through the legislative branch of the government, has been overruled by the judiciary.

In discussing the fact that inmates awaiting the death penalty should not be kept in the penitentiary indefinitely, Governor Brown was quoted by the press recently as having said that no executions have been consummated in this state during the past ten and a half months, that he had granted only two commutations, and that stays of execution by either the Supreme Court or other courts accounted for all the rest of the postponements of scheduled executions, saying: "And in the meantime, the number on condemned row are piling up and the living conditions, of course, there—they're locked up in small cells 22 out of 24 hours every single day.

"Some of them have been there as long as seven and a half and eight years while these court proceedings go on; neither the bar nor the courts recognize this fact, and it's a situation *that really means that capital punishment has been repealed by the courts.*" (Italics added.)

I would therefore affirm the judgment in its entirety.

Respondent's petition for a rehearing was denied April 15, 1964. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.