[Crim. No. 3186. Fourth Dist., Div. Two. Nov. 22, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MIGUEL ANGEL VALENCIA, Defendant and Appellant.

Lawrence M. Gassner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald F. Russo, Deputy Attorney General, for Plaintiff and Respondent.

McCABE, P. J.—Following a jury trial, defendant was found guilty of kidnaping for the purpose of robbery (Pen. Code, § 209). Probation was denied and he was sentenced to state prison. Defendant appeals from the judgment of conviction.

At approximately 7:15 p.m. on August 5, 1967, Mrs. Nancy Jenkins and her four children returned to their home in Upland after a week's absence. At 9:15 p.m., Mr. Jenkins and the children were preparing for bed while Mrs. Jenkins looked through the accumulated mail. The doorbell rang. Mrs. Jenkins answered it and four armed men forced their way into the home. The men were wearing dark jackets, dark pants, white gloves and identical masks. Mr. and Mrs. Jenkins were compelled to lie face down on the bed, and Mrs. Jenkins' hands were tied. They were told to cooperate or the entire family would be killed.

Mr. Jenkins was then questioned about his market in Pomona. Mrs. Jenkins noticed that one man wore wide strap, brown leather sandals, dark stockings and a wide belt. Mr. Jenkins was taken to the living room for further questioning. Mrs. Jenkins was permitted to go to the back bedrooms to see the children. At some later point, one of the men forced Mrs. Jenkins into a back bedroom, told her to lie on the bed, climbed on top of her and threatened her. About 5 minutes later the man in the sandals came into the bedroom and ordered the other man out. The bedroom was dark, but occa-

sionally the door would open emitting light from the hall. When this occurred, Mrs. Jenkins could see the face of the man wearing sandals who, because of the heat of the evening, had placed his mask on the top of his head. At the trial, she positively identified the defendant as the man wearing the sandals.

The discussions with Mr. Jenkins in the living room concerned ways to obtain the money from his market. Mr. Jenkins told the men that he did not have the keys to the market. There was a maintenance crew cleaning the floors and the crew would be in the market all night. One of the gunmen said, "You will have to get in anyhow. We don't particularly care how you do it, but you have got to get into the market and do this or else we will, you know, have your children." Mr. Jenkins was told that at 11 or 11:30 he was to call the market and tell the maintenance people that he would be there sometime after midnight to inspect their work. Mr. Jenkins placed the call and did as he had been instructed.

Between 12:15 and 12:30 a.m., Mr. Jenkins, defendant, and another suspect left the home. Two suitcases were to be used to carry the money. It was explained that Mrs. Jenkins and the oldest boy would be removed from the home and that one of the men would be stationed near the market. If the operation did not go as planned, defendant would telephone the Jenkins' home and instruct the other gunman to shoot the children. As they drove to the market both men had their guns pointed at Mr. Jenkins. When they reached the market, one man got out of the car and went to a telephone booth to wait. Defendant remained in the car and told Mr. Jenkins that he had 15 minutes to get the money, that the other man was across the street and could see everything, and that if everything didn't go "just right" his family would be shot. Mr. Jenkins then entered the store, set off the silent alarm and telephoned the police. Within two or 3 minutes officers arrived on the scene but defendant was not in the car and the car keys were missing. A search of the area around the market uncovered two masks, a pair of white gloves, two coats and two walkie-talkie radios taken from the Jenkins' home.

At approximately 2:35 a.m. on the morning of the incident, Officer Chester A. Thomas of the Pomona Police Department was conducting an area search near the market when he observed defendant wearing a tee shirt, dark pants, a wide belt, wide strap leather sandals and dark stockings. Thomas also observed a portion of what appeared to be a revolver protruding from defendant's right rear pocket. The officer

stated, "Halt. Pomona Police Officers." Defendant took three or four steps, turned and faced Thomas, moving his hand toward the pocket containing the gun. The officer, with his service revolver drawn, again stated, "Hold it, police officers." Defendant was then placed under arrest and searched. The search revealed a loaded revolver, later identified as similar to the one pointed at Mr. and Mrs. Jenkins, and a key case, identified by Mr. Jenkins, containing keys to the Jenkins' automobile. Defendant was then advised of his *Miranda*-defined [384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)] constitutional rights, and he stated he understood and was willing to talk. Thomas then asked if defendant had been involved in the kidnaping and attempted robbery of the market, and he replied, "Yes. I am caught." Immediately following the booking procedure, Officer Thomas again advised defendant of his constitutional rights, including a statement that the police would contact the public defender's office or allow defendant to make the contact before any questioning. At this time defendant was further advised, "We would not proceed if he desired to remain silent and to call the public defender." Defendant stated that he understood his rights and did not desire to call or have the officers call the public defender. From the transcript of the trial it does not clearly appear that there was any further conversation with defendant on this occasion.

At approximately 3 a.m. on the same date, Captain McCarthy and Detective Estes spoke with defendant. On this occasion Detective Estes advised the defendant of his *Miranda*-defined constitutional rights. In addition to the verbiage contained in the two prior advisements, Detective Estes advised defendant he had a right "to consult with an attorney before making any statements;" and he had "a right to an attorney during . . . in the presence of an attorney during his questioning or at any time hereafter;" if "he could not afford to pay counsel, counsel will be furnished you by the court." Defendant stated he understood his rights and stated he was willing to talk with the officers. During this conversation defendant admitted he had been around the Jenkins' residence and the market in Pomona; and that he had attended high school and junior college.

On August 8, 1967, at 9 a.m., before arraignment, the same officers had another conversation with defendant. He was advised of his constitutional rights, stated he "fully understood" his rights and again agreed to talk to the officers. The

conversation lasted 30-45 minutes. Defendant stated that: he had been to the Jenkins' home; he helped "plan the job;" he was armed; he went with Mr. Jenkins to the market; and, after Mr. Jenkins had been in the market for a few minutes, he felt something had gone wrong and called off the operation. It was arranged that after the arraignment the officers would return in the afternoon to take a complete statement from defendant.

At 2:30 p.m. on August 8, following defendant's arraignment, and the appointment of the public defender, a taped conversation was had with defendant. During this third conversation, defendant related that: he and three other individuals went to the Jenkins' home and entered when Mrs. Jenkins opened the door; Mr. and Mrs. Jenkins were asked to lie on the bed; Mrs. Jenkins' hands were tied behind her back; the two Jenkins' boys were tied in their bedroom; Mr. Jenkins was informed that the men were in the home to get the money from his market; the men remained at the home from 9:20 p.m. until 12:20 a.m.; he and another individual accompanied Mr. Jenkins to the market; he carried a loaded .22 caliber revolver; after a few minutes at the market, he felt something had gone wrong and called off the operation; he left the area; he observed police cars arrive and concealed his mask and jacket; he went back to the market and hid near the vehicle; later, as he was again leaving the area, he was arrested; and he had surveyed the market on prior occasions.

In a hearing conducted outside the presence of the jury, the trial court specifically found that defendant had been thoroughly advised of his rights prior to each conversation with officers, that he understood his rights, that he intelligently waived his right to be represented by counsel during the questioning and that any admissions or confessions made during any of the conversations were voluntary. The defendant did not offer any evidence.

On appeal, it is first urged that the trial court was required to exclude on motion all statements made by defendant after appointment of the public defender and without his consent to the interrogation. The Attorney General contends that defendant waived his right to have counsel present.

In *People* v. *Isby,* 4 Crim. 3153 [filed November 19, 1968) *ante,* p. 484 [73 Cal.Rptr. 294], this court concluded that *Massiah* v. *United States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and the Sixth Amendment to the United States Constitution require that after a criminal charge has been filed against a defendant and he is represented by coun-

sel, he may not be subjected to an interrogation instigated by law enforcement officers for the purpose of eliciting incriminatory statements in the absence of his counsel. (*People* v. *Isby, supra.*)

The third confession herein was obtained after the criminal complaint was filed and after appointment of defense counsel at arraignment, but in the absence of defendant's appointed attorney. Thus, the case at bench fits squarely within our holding in *Isby* and we conclude that the trial court committed constitutionally proportioned error in admitting the third statement. Moreover, *since we are here concerned with a confession, rather than an admission,* in determining the effect of this error on the judgment, we are confronted with the well recognized rule that the introduction in evidence of a *confession* obtained from defendant in violation of constitutional guarantees is prejudicial per se and compels reversal regardless of other evidence of guilt. (*In re Cameron,* 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633]; *People* v. *Powell,* 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]; *People* v. *Rollins,* 65 Cal.2d 681, 692-693 [56 Cal.Rptr. 293, 423 P.2d 221]; *People* v. *Schader,* 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665].)

However, in view of the fact that, prior to arraignment and the appointment of counsel, defendant made two clearly admissible confessions we must decide whether, from the record before us, we have a "rare exception case" in which the erroneously admitted confession had no bearing on the result. (*People* v. *Cotter,* 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862] [vacated on other grounds 386 U.S. 274 (18 L.Ed. 2d 43, 87 S.Ct. 1035)]; *People* v. *Jacobson,* 63 Cal.2d 319, 329, 331 [46 Cal.Rptr. 515, 405 P.2d 555].)

The rationale of the rule of prejudice per se is that a confession, by its very nature, constitutes such persuasive evidence of guilt that in most cases it is extremely difficult to determine what part it played in securing the conviction. (*People* v. *Schader, supra,* at p. 729; *People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001].) The rare exception rule was formulated because in certain multiple confession cases an appellate court could conclude that there was no reasonable possibility that admission into evidence of the improperly obtained confession contributed to the conviction. (*People* v. *Cotter, supra,* 63 Cal.2d 386, 398; *People* v. *Jacobson, supra,* 63 Cal.2d 319, 330; *People* v. *Janssen,* 238 Cal.App.2d 106, 110-111 [47 Cal.Rptr. 453].)

These requirements must be met before the rare exception rule may be applied. It must appear from the record that (1) the inadmissible statement did not contain details significantly different from the other confessions; (2) no undue emphasis was placed on the erroneously admitted confessions by the prosecution; and (3) the sequence of confessions was such that there could be no implication that the legally obtained confessions were induced by those improperly obtained. (*People* v. *Powell, supra,* 67 Cal.2d 32, 53; *People* v. *Jacobson, supra,* 63 Cal.2d 319, 331.)

The case before us presents just the type of facts for which the rare exception rule has application. There is no indication from the record that the prosecution placed any undue reliance on the erroneously admitted confession. The information disclosed by defendant's second and third statements is substantially similar in all important particulars. Furthermore, in view of the sequence of confessions, it cannot be said that the improper statement in any manner induced those statements properly obtained.

Putting aside all of defendant's statements, the evidence of guilt was overwhelming. He was positively identified by Mrs. Jenkins. Police officers arrested him a few blocks from the Jenkins' market in the apparel described by Mrs. Jenkins, carrying a loaded gun similar to that used in the kidnaping and with keys to the Jenkins' automobile in his possession. When these facts are buttressed by defendant's statement to the arresting officer and his subsequent admissible confession, we must conclude that beyond a reasonable doubt the erroneous admission of defendant's final confession did not contribute to the finding of guilt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

It is next urged that the trial court erred in allowing the investigating police officers to remain in the courtroom after all other witnesses were excluded. However, defendant fails to indicate in what manner, if any, he was prejudiced. (*People* v. *Duckett,* 210 Cal.App.2d 867, 870-871 [26 Cal.Rptr. 926].) Moreover, no objection was made on this question below and it cannot be considered when made for the first time in the appellate tribunal. (*People* v. *Boyden,* 116 Cal. App.2d 278, 284 [253 P.2d 773].)

Defendant's third contention is that the trial court erred in refusing to instruct the jury concerning burglary and grand theft. The charge in the information was kidnaping for the purpose of robbery, Penal Code, section 209. The jury was instructed on the law pertaining to this

crime. Instructions were also given concerning a simple kidnaping and the jury was told that it could find defendant guilty of this lesser and necessarily included offense. Defense counsel sought instructions on the crimes of burglary and grand theft on the theory that the kidnaping could have been with the intent to commit either burglary or grand theft rather than robbery and that, therefore, the jury would find defendant not guilty of the crime charged in the information. The trial court refused to give these instructions on grounds that they were inapplicable under the evidence introduced at trial and that they would confuse rather than assist the jury.

The general rule is that a defendant is entitled to jury instructions on his theory of the case as disclosed by the evidence, no matter how weak; the fact that the evidence may not be of a character to inspire belief does not justify refusal of an instruction based thereon; however incredible a defendant's testimony, he is entitled to an instruction based upon the hypothesis that it is entirely true; it is prejudicial error to withdraw from the jury consideration of such evidence. (*People* v. *Miller*, 57 Cal.2d 821, 829 [22 Cal.Rptr. 465, 372 P.2d 297]; *People* v. *Carmen*, 36 Cal.2d 768, 773 [228 P.2d 281]; *People* v. *Garcia*, 250 Cal.App.2d 15, 17 [58 Cal.Rptr. 186]; *People* v. *Morrison*, 228 Cal.App.2d 707, 712 [39 Cal. Rptr. 874].) However, it is also clear that entirely accurate instructions may be properly refused if there is no evidence to which they may relate. (Witkin, Cal.Crim. Procedure (1963), §469, p. 477.) A review of the facts of the case at bench requires us to conclude that the latter rule has more force. No evidence was introduced on behalf of defendant and all the prosecution's evidence was directed toward the theory that the kidnaping was for the purpose of robbery. Defense counsel was permitted to argue to the jury the theory that the purpose of the kidnaping was for burglary or grand theft. Under these circumstances, the refusal to give instructions on the definitions of burglary and grand theft was not error.

Defendant next argues that the trial court erred in admitting into evidence that portion of his third statement to police which revealed that he had some knowledge of "how to blow a safe." He also related that he had blown open an old safe with dynamite as an experiment.

"The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference to establish any fact material for the

People or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible. . . .'' (*People* v. *Sanders,* 114 Cal. 216, 230 [46 P. 153]; *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].)

The Attorney General argues that this evidence tends to establish defendant's plan for the market robbery and was properly admitted to show defendant's purpose in the kidnaping. However, the testimony that defendant on some prior occasion had experimented with dynamite on a safe, when the other evidence before the court revealed defendant's plan to have Mr. Jenkins open the safe at the market, established no more than defendant's criminal disposition or bad character and consequently should have been excluded. (*People* v. *Kelley,* 66 Cal.2d 232, 243 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Westek,* 31 Cal.2d 469, 476 [190 P.2d 9].) Nevertheless, in view of the overwhelming evidence of guilt it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Finally, defendant urges, without citation of authority or reference to the transcript, that the trial court was required to strike on motion all hearsay statements of suspects, other than the defendant, not shown to be uttered in the presence of the defendant or as part of the conspiracy in which defendant was involved. This complaint is not supported by the record and is, therefore, without merit.

Judgment affirmed.

Kerrigan, J., and Tamura, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 15, 1969.