[Crim. No. 29948. Second Dist., Div. Two. May 11, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY JOE BOOKER, Defendant and Appellant.

COUNSEL

Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLEMING, J.**—This case was originally an automatic appeal from a judgment imposing the death sentence after a jury convicted appellant of four counts of first degree murder and kidnaping for the purpose of robbery. The Supreme Court transferred the case here after holding unconstitutional the California death penalty statutes then in effect. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101].) Accordingly we must reduce the penalty imposed to confinement in the state prison for life. (Pen. Code, § 190.)

Appellant's contentions are as follows: that no substantial evidence was presented to show that the murders were deliberate and premeditated; that he was denied effective assistance of counsel at the trial; that his confessions taped on 29 August and 30 August 1974 were inadmissible both because they were involuntary and because they were taken in violation of his *Miranda*[1] rights; and that he was improperly excluded from the courtroom during his trial. His other contentions go to the constitutionality of the sentence of death and accordingly are no longer relevant.

The facts show that appellant kidnaped a 25-year-old woman and her 14-month-old daughter, Audrey Lee Gaines and Heather Michelle Gaines, from a Lucky Shopping Center in the City of Monrovia on 22 August 1974, drove about with them for some two and one half to three hours, and eventually took them to a remote location in Monrovia Canyon Park about 4/10 mile north of the canyon park gate where he murdered both of them in a particularly violent and brutal manner, as

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

well as raping or attempting to rape the mother. Defendant and his brothers then absconded to New Mexico where they were taken into custody for robbery committed in Hobbs, New Mexico, on or about August 26. The Los Angeles County Sheriff's deputies found the bodies of the victims on August 28. On August 29 and August 30, while incarcerated in New Mexico appellant made statements to Sergeant Sett of the Los Angeles County Sheriff's Department and Sergeant Buck of the Monrovia Police Department, confessing to the kidnap and murder of both Audrey and Heather Gaines, but denying rape or attempted rape. Appellant stated that on August 22 his common law wife, Verna Aulenback, had hung up on him; he was enraged and took a kitchen knife from his mother's home. In front of the laundromat in the Lucky Shopping Center he saw the victim's station wagon; the young mother had just loaded her laundry into her station wagon and was sitting in it with her baby. He wrapped a denim jacket around his arm and told Audrey that he had a gun and would kill her if she did not cooperate, and that he wanted her car. He got into the back seat of the car and forced her to drive around for about half-an-hour, following which he caused her to park the car in the canyon park, to get out of the car and walk toward some hedges, which she did, carrying her baby. He told her to undress and lay down upon a yellow blanket which he had taken from the car; she put the baby down and obeyed. He then got on top of her, strangled her and cut her with his knife; then he strangled the baby and beat both victims with a rock. Then he drove some distance away and at about 7:30 p.m. he robbed one Michael Cotton at a USA gas station in Monrovia, using the kitchen knife previously used to slash the victims. He later abandoned the car, which the police located about 8 p.m. on East Olive St. in Monrovia containing the victim's purse and the baby's car seat. He had wiped his fingerprints off the car with a towel.

Three eyewitnesses to the kidnaping testified. Eugene Tapia, a barber whose shop is located in the Lucky Shopping Center in Monrovia, observed the victims' station wagon parked in the lot outside his shop on August 22. He saw Audrey putting clothes in her car and her little girl. He saw appellant coming around the corner of Lucky's market as if he were in a hurry; he talked to Audrey at the window of the car, leaning on the car with one arm halfway in the car window and a coat over his hand. He was wearing a flashy purple knitted shirt, which Mr. Tapia identified at trial. Audrey reached back and opened the back door of her car, and appellant jumped in the back and sat behind her. Audrey appeared to mouth something to Mr. Tapia which he thought was "Help. Call the police." Mr. Tapia was "kind of shocked" and made a note of the car license plate and called the police. He testified that these events took

place about 4:30 p.m. on 22 August 1974. He identified appellant as the man he had seen and identified the victims from pictures.

The witness Bradford Brown testified that about 6:10 p.m. on August 22 he observed a station wagon near the intersection of Loma Alta and Skyview in Altadena, with appellant in the back seat and Audrey Gaines, the victim, driving. She had a very blank expression and they were going very slow. Mr. Brown took the license number, which eventually proved to be that of Mrs. Gaines' automobile. Mr. Brown also identified appellant's purple shirt.

At about 7 that evening a David R. Anchondo observed a white station wagon near Myrtle and Hillcrest. The car was going slowly north; a woman and child were in the front seat and a "huge black man" was sitting in the back seat, wearing a leather hat with silver buttons on it and glaring out of the window. Anchondo identified the car he had seen as the victim's from pictures.

Two of the foregoing eyewitnesses identified appellant as the man they had seen in the back of the victim's car and all three identified the mother, Audrey Gaines, or her car, from pictures and from the car's license plate. Also, appellant's sister identified the purple shirt belonging to appellant which Mr. Tapia recognized at trial, and the sister testified that appellant was carrying the shirt when he came home some time on the evening of August 22.

When the bodies of Audrey Gaines and her 14-month-old daughter Heather were found on August 28, the mother was lying on her back wearing only a halter top, and some trees or branches had been dragged over her face. To the north of her head was a large rock with a reddish brown stain later found to be human blood. There was a four-inch gash on her neck and chest and numerous scratch wounds and severe abrasions on her body. A vaginal smear taken from her body indicated the presence of sperm. The child's body lying near the mother's showed multiple severe injuries to the head and face including massive skull fractures probably resulting from very severe crushing or blunt force. Unusual dark red bruises on the child's thigh probably resulted, according to the coroner, from squeezing by a human hand. The coroner's evidence indicated that the mother probably died from severe crushing injuries to the face or possibly strangulation (there was evidence of both), rather than from repeated slashing wounds which were not fatal. As stated, there was also evidence of rape, but no way to ascertain if it occurred before or after the victim's death. In the interests of

decency we refrain from summarizing in further detail the coroner's evidence, which was of course undisputed and showed incredibly brutal and vicious beatings of both victims.

The circumstances surrounding appellant's confessions were as follows: as stated, appellant and two of his brothers were in custody in the Lea County jail, Lovington, New Mexico, for a robbery in Hobbs, New Mexico, committed about August 26. At that time the victim of the USA gas station robbery in Monrovia had tentatively identified the robber from pictures as appellant's brother, Lonnie Ray Booker. Upon hearing that three of the Booker brothers were in custody in New Mexico, Sergeant Sett and Sergeant Buck went from California to New Mexico to investigate the disappearance of Audrey and Heather Gaines. Meanwhile Lieutenant Wright of the Hobbs police had on August 24 fully advised appellant of his *Miranda* rights by giving him an "advice of rights" card which he read and also reading the card to him. Wright asked appellant to read the rights and to sign them if he understood them. Appellant did sign the card, and stated that he could read and write English and had two years of college. Appellant was willing to talk about the New Mexico charges, but wanted an attorney. Accordingly at his New Mexico arraignment on August 26, he was assigned counsel, a deputy public defender who apparently advised him not to talk to anyone. When Sergeant Sett of California (sheriff's department) came to the jail on August 27, Lieutenant Wright told him that appellant had been advised of his rights and given counsel. That evening Officer Sett questioned appellant and his brother Lonnie at the jail about their activities on August 22 (the day of the murders). Appellant stated that he had been in Monrovia all day engaged in activities such as shopping and dice, and that subsequently they had come to Hobbs to see appellant's girlfriend Verna. No confessions were made on that day.

The following day, August 28, at about 5 p.m., Sett learned of the discovery of the victims' bodies in Monrovia. He then returned to the Lea County jail and interrogated Lonnie and Mack Charles Booker further. Just as Sergeant Sett was about to conclude his interview with them, Lonnie said that he had been talking to his brother and he thought appellant wanted to talk to Sett. Appellant was brought down to the interview room, and stated that he wanted to make a statement to the California officers; but that first he wanted to talk to his girlfriend Verna. Sett asked the New Mexico sheriff to locate her, and she was brought to the county jail about 12:30 a.m. on the 29th. After talking to Verna for about 20 minutes, appellant stated that he wanted to make a statement to the officers. Sett stated that he was very tired and that he

was sure that appellant had been up a long time and would rather talk in the morning, but appellant stated that he wanted to talk to the officer then because he might not feel like it in the morning. Accordingly tape-recording equipment was set up. Sergeant Sett and Sergeant Buck on tape advised appellant of his rights under *Miranda* to remain silent, to have an attorney, and to have one appointed free of charge. They did not mention that anything he said might be used against him. They asked appellant if he understood his rights and if he wanted to waive his rights to an attorney at that time and talk to the police, and he said, "Yes." He then confessed to the robbery of the USA gas station in Monrovia in a white Ford station wagon and described his abduction of the car and its occupants in front of the laundromat in the Lucky Shopping Center. He stated that he took the automobile, disposed of the lady and the baby, and then robbed the gas station, and then wiped his prints off the car and abandoned it. In response to the officer's further questions he added details as to his drive with the victims and the murders. He described the victim and her clothing accurately and admitted slashing the victim with the knife. He stated that he lay down on top of her to strangle her and denied any rape or attempt at rape. He also admitted strangling the baby and beating both victims with the rock. He also stated that at the gas station robbery he told the youngster he robbed "no hollering cause if he did; I'd kill him. He had something to live for, I didn't." Toward the end of the interview appellant asked the officers not to tell Verna the details of his actions, and the officers said that although she would probably find out anyway they would not tell her or discuss the case with her. They then ended the interview.

Later in the day on August 29, appellant requested an opportunity to make further statements, but wished to talk to Verna first. When she could not be located, he declined to say anything and no pressure was applied nor any statements taken. On August 30, Verna was brought to the jail again and after talking to her appellant was interrogated again with a tape recorder at about 8 p.m., in the presence of Officers Sett and Buck and the Lea County Sheriff. The officers read appellant a statement which this time included the full panoply* of his *Miranda* rights, including the precaution that anything he said might be used against him. This time appellant said that "To be truthful, I don't feel like even going into it." and "Say, isn't it enough for me to just say well, uh, officer, I—I committed the crime?" To which the officer responded, "Well, no, it's really not, because there are people that do confess to crimes that are not guilty of 'em, and that's why we have to question people about it, to make sure that they in fact did or didn't do it."

Appellant responded, "Well, I'm guilty of these. All of 'em." The following exchange occurred:

"Q. Do you mind if I go over a little bit of it?

A. Hey man, I'm gonna tell you up front, there's certain things you gonna ask, but I'm not gon' answer.

Q. You're not gonna answer. Uh, yes. . .

A. Well, I just admit, I done it.

Q. SGT. BUCK: There's certain things you're not gonna talk about, is what relate to your brothers, and family, and this type of thing?

A. Just certain things I not gonna talk about.

Q. Well, if you have us an idea, of those areas, we'll stay away from them. I—I think probably the best way to handle this for everybody is for you to just tell your story, and we'll sit back and listen.

A. I already told one story that you got on tape. The ugly details to everything that I was asked, right?

Q. SGT. SETT: Okay. Well I think you know that we know that you held back in certain aspects of it, and you indicated last night to us, and you told us that, if we get Verna, so you could talk to her, you will tell us everything.

A. I told you everything. I done it.

Q. We know, but you said there was something more, and I believe there is something more."

Following this exchange, the officers questioned appellant further about raping the victim, and he vigorously denied it. He also went over some of the details already previously discussed relating to his long drive with the victims and the details of the crimes. At one point, the officers offered him coffee, which he accepted. Appellant admitted to wearing the purple shirt referred to above. He stated that he killed the woman to keep from being identified, and when asked why he killed the baby he said, "I couldn't think of a reason." He also said that he was very angry at Verna at the time because she had hung up on him.

Appellant took the stand at the hearing to suppress the tapes and testified that when he made the foregoing statements he was not in his right mind because he had been drugged, because he had not slept for 48 to 72 hours before the August 29 statement due to continuous dripping of the water in the shower in his cell, and because the officers put drugs in his coffee. The officers denied giving appellant any drugs and testified that everyone drank out of the same coffee pot during the second interrogation. Lieutenant Wright testified that appellant appeared to be in full control of his faculties at the time of the taped conversations and that he did not appear to be intoxicated when he was first read his *Miranda* rights on August 24.

On the foregoing evidence, and after listening to the tapes, the trial court denied the motion to suppress and they were duly entered into evidence.

Appellant contends that under the doctrine of *Massiah* v. *U.S.* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 84 S.Ct. 1199], the police had no right to interrogate him once he had counsel appointed (on the New Mexico offense). Also, the recent United States Supreme Court case of *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232], holds that "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." (430 U.S. 387, 401 [51 L.Ed.2d 424, 438]) But there counsel had appeared in court with defendant, who had been arraigned before a magistrate on an arrest warrant for the abduction of the murder victim. Patently, adversary proceedings had already started in respect to the crime for which defendant was later interrogated. The court ruled in *Brewer* that once adversary proceedings have started, statements made to the police in the absence of counsel can only be admitted if the state meets a "heavy burden" of showing an express and knowing waiver of the right to counsel. In this case, however, no adversary proceedings had commenced against defendant concerning the crime about which he was being interrogated. No arrest warrant had issued on the murder charges and no extradition proceedings were underway. Accordingly the case should be governed by *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187-188 [133 Cal.Rptr. 511, 555 P.2d 297]. After *Massiah* it was unclear whether all interrogation in counsel's absence at the preindictment state constituted a constitutional violation. The court in *Duck Wong* held that during the investigatory pre-indictment stage of a criminal proceeding, the police may interview a suspect if he voluntarily waives his *Miranda* rights, because there are compelling policy reasons to permit full investigation of a crime in order

to gather evidence to make a formal charge. These policy reasons no longer apply once charges have been filed. Accordingly the court declined to extend the rule of *Massiah* and cases following it (such as *People* v. *Isby* (1968) 267 Cal.App.2d 484 [73 Cal.Rptr. 294]) to the preindictment stage, and instead adopted the rule articulated originally in *People* v. *Garner* (1961) 57 Cal.2d 135, 149, 152 [18 Cal.Rptr. 40, 367 P.2d 680], and reaffirmed after *Massiah* in *Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 701 [103 Cal.Rptr. 379], that interrogation of defendant in the absence of counsel does not per se render his confession inadmissible, provided no criminal charges have been filed against him. Here the only charges that had been filed against appellant involved the New Mexico robbery. When they came to New Mexico to interrogate appellant, the California police were investigating the kidnaping and disappearance of Audrey and Heather Gaines, whose fates were unknown at that time. No charges had been filed against appellant regarding those matters, nor had counsel been appointed to defend him regarding them. Accordingly although counsel had been appointed on the New Mexico charges, the interrogations investigating the California crimes were permissible. Further, the court in *Brewer* v. *Williams* did not intend to preclude the possibility of an accused voluntarily participating in an interrogation out of the presence of counsel. The court stated: "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." (430 U.S. at pp. 405-406 [51 L.Ed.2d at p. 441].) Thus, even if counsel had been appointed for appellant in connection with the Gaines' kidnapings (later discovered to be murders), a voluntary waiver of counsel's presence during appellant's communications with police would still have been possible.

Under all possible assumptions connected with *Brewer* the prosecution carried its "heavy burden" to show voluntary waiver. The critical facts are that appellant himself requested the opportunity to make the first statement, despite the attempts of the police to postpone it. Although appellant wanted and received the opportunity to talk to his girlfriend, he never asked to see his attorney. If appellant's first confession be not regarded as voluntary, we can hardly conceive a case where the state could meet its burden of showing waiver. The evidence shows that the police "scrupulously honored" appellant's initial decision not to say anything to them (see *Michigan* v. *Mosley* (1975) 423 U.S. 96, 104 [46 L.Ed.2d 313, 321, 96 S.Ct. 321]). There is no evidence other than appellant's uncorroborated testimony that he had been given drugs at any time while in custody in New Mexico. Further, the police appeared

to have gone to great lengths to provide whatever appellant desired during the interrogation, including bringing his girlfriend to the jail twice at his request. As stated in *Michigan* v. *Tucker* (1974) 417 U.S. 433, 444 [41 L.Ed.2d 182, 193, 94 S.Ct. 2357], ". . . no one could contend that the interrogation faced by respondents bore any resemblance to the historical practices at which the right against compulsory self-incrimination was aimed."

■ Appellant contends that his *Miranda* warning on the 29th omitted the phrase that anything he said might be used against him. However he had been warned of that possibility on the 26th and in view of his age, intelligence and understanding as exhibited to the trial court, the court found his *Miranda* waiver to have been knowing and voluntary. That finding is not "palpably erroneous" on this record. (*People* v. *Long* (1970) 6 Cal.App.3d 741, 748 [86 Cal.Rptr. 227].) At the subsequent interrogation on August 30, appellant did show some reluctance to discuss the details of his crime, but affirmatively and voluntarily reiterated his confession of guilt. There is no evidence that the officers overbore his will or forced him to discuss anything that he did not wish to discuss. Further, one warning of Fifth Amendment rights under *Miranda* v. *Arizona* can suffice to establish the voluntariness of several subsequent interrogations; the question of voluntary and knowing waiver remains one for the determination of the trial court under all the facts and circumstances. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265].)

The facts in *Brewer* v. *Williams* were that while driving the defendant from Davenport to Des Moines, Iowa, after his arraignment, a police officer applied subtle psychological pressure in response to which defendant led the police to the victim's body. Before the ride defendant had stated that he would not "talk" until he got to Des Moines, and the police had promised his attorneys in both Davenport and Des Moines that they would not interrogate him during the drive. At bench, in contrast, the police applied no psychological pressure or similar ploys to appellant before the first confession, and he affirmatively stated he wanted to talk. If, as counsel on appeal urges, appellant felt impelled to confess because he feared his brother might otherwise be arrested for the murders, this pressure did not result from any acts of the police, but instead resulted solely from appellant's crimes and his resemblance to his brother. Accordingly there is no indication here of overreaching police conduct that should be deterred by applying the exclusionary rule. It appears to us that during both interrogations the police exerted every effort to treat appellant fairly and courteously, and that there is no

evidence whatsoever of any police conduct that should be discouraged by excluding from evidence appellant's taped statements.

What is more, even if the second interrogation might be deemed invalid in view of defendant's reluctance at that point to talk (although we do not think it was), the admission of that taped conversation could not be prejudicial in light of the clearly valid admission into evidence of the tape of the first interrogation. (See *People v. Valencia* (1968) 267 Cal.App.2d 620, 628 [73 Cal.Rptr. 303], to the effect that where there is overwhelming evidence of guilt and prior untainted confessions, a "rare exception" is made and the admission of a subsequent tainted confession is not held to be automatically prejudicial.) (See also, *People v. Enriquez,* 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261].) The use of the first taped statement coupled with the testimony of three eyewitnesses would undoubtedly have sufficed to convict defendant.

 There is ample evidence to sustain the first degree murder convictions either on a theory of premeditation and deliberation, or on felony-murder theories of murder during the perpetration of (1) kidnaping for robbery or (2) attempted rape. (*People v. Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People v. Powell* (1974) 40 Cal.App.3d 107, 163-164 [115 Cal.Rptr. 109]; *People v. Goodridge* (1969) 70 Cal.2d 824, 838 [76 Cal.Rptr. 421, 452 P.2d 637]; *People v. Quicke* (1964) 61 Cal.2d 155, 158-159 [37 Cal.Rptr. 617, 390 P.2d 393].) In *Hillery,* the court found in evidence of premeditation that defendant entered a house surreptitiously, dragged the victim to a secluded spot, where she was found dead with clothing removed from her breasts and her own shears plunged into her chest in a manner that must have been calculated to produce death. There was no evidence of sexual penetration in *Hillery,* but the court found the foregoing facts sufficient to support the jury's finding of intent to murder, particularly in view of defendant's conduct in taking care to avoid discovery. Similarly here, appellant removed his victims to an isolated spot before attacking and murdering them, and there is more evidence of attempted rape here than in *Hillery,* in view of the finding of seminal fluid in the vagina. When a conviction of first degree murder is based on the theory of killing during an attempted rape, it is irrelevant whether the victim was already dead at the time of penetration. (*People v. Goodridge, supra*; *People v. Quicke, supra.*) Also the evidence here shows that appellant murdered his victims as part of the stream of events constituting his kidnaping of them for purposes of robbery of the automobile. (Cf. *People v. Powell, supra,* in which defendant kidnaped police officers, drove them to an isolated onion field, robbed them of guns, money, and

flashlights, and shot one of them. The *Powell* court found the murder to have been perpetrated during the course of a kidnaping for robbery and accordingly to have been of the first degree, on the theory that until the defendants had reached a place of safety the kidnaping was still in progress. (*People* v. *Powell, supra,* 40 Cal.App.3d at p. 164.) Appellant's admitted motive for the killing of the mother was to prevent her from identifying him, which establishes the killing as in furtherance of the kidnaping for robbery. Appellant claimed he did not know why he murdered the baby, but the jury might well have inferred that he feared her crying might attract attention and aid in his apprehension. This case is unlike *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 477 P.2d 942], in which the evidence showed only a violent and bloody murder apparently performed without any prior planning activity or subsequent attempt at concealment, and with no evidence whatsoever of sexual molestation. Rather, we have evidence of a preconceived plan to steal an automobile; a forcible kidnaping of the occupants of the automobile; a calculated removal to a place of isolation, as in *Hillery,* and a killing that was clearly intentional and that was probably committed during or following an attempted rape.

■ The circumstances surrounding appellant's exclusion from his trial are as follows: at the outset of the trial proceedings, appellant requested the court to dismiss his attorney, Mr. Carney of the public defender's office, because "I don't feel that he is qualified to give me his best." Appellant said that his attorney was prejudiced against him and that the judge and all of the jurors were also prejudiced in advance. The court disagreed and stated that Mr. Carney was an able attorney and that appellant would be well-advised to cooperate with him in order to present the best possible case. The court and appellant then engaged in a long colloquy during which the court did its utmost to persuade appellant to come into the courtroom with his attorney and to cooperate in his own defense, but appellant flatly refused and stated that he would not sit through the trial and be "a test case for the state" and that if he were in the courtroom he would "object to certain things and I am going to get up and speak my opinion on it. I am not going to just sit here." On the subject of appellant's violent propensities, there was testimony by Deputy Sheriff Sett that while appellant was in a "hard cell" he had ripped up a bed that was welded to the floor and the wall and ripped the sink from the wall, and did the same with the commodes in three cells, and that he also attempted to cut his own arm with a piece of the bed. He also broke eight sets of restraining straps at central jail. Accordingly the court arranged to have appellant placed in a detention room wired for sound near the courtroom and told him that if at any time he changed

his mind and felt that he could sit quietly in the courtroom he had only to say so and he would be brought in. On the first day of trial, 27 February 1975, appellant was held in the room wired for sound. On February 28 appellant stated that he wished to be present and the court stated that it was glad that he had made that decision, and he was initially present in the courtroom on that day. After some testimony had been presented, however, appellant burst out, referring to his attorney: "I don't want this racist dog here. I don't want him because he is not representing me properly because I can't trust him, and I have already informed the Court of this and the People." He then spat at his attorney. The court asked the bailiff to advise appellant that at such time as he wanted to contain himself he could return to the courtroom, and admonished the jury not to infer anything regarding guilt or innocence by reason of appellant's remarks or his blow-up. Appellant spent the remainder of his trial in the detention room wired for sound. He did, however, sit in the courtroom during the special circumstances penalty phase of his trial.

In view of appellant's violent behavior in the courtroom and the testimony of his violence while in custody, there is no question but that the trial court had the right to exclude him from his trial as it did, with full permission to return if and when he could control himself. (*Illinois* v. *Allen* (1970) 397 U.S. 337, 342-343 [25 L.Ed.2d 353, 358-359, 90 S.Ct. 1057]; *People* v. *Brown* (1972) 26 Cal.App.3d 825, 840 (fn. 6) [102 Cal.Rptr. 518].) The fact that the court's promise to let appellant return was given in good faith is evidenced both by the court's repeated and prolonged urging of appellant to come into the courtroom and cooperate in his trial and the court's allowing him to sit through the penalty phase of the trial when he finally exhibited control.

■ The burden of sustaining a claim of inadequate trial counsel rests on appellant, and he must offer proof that is a demonstrable reality and not a speculative matter. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) ■ The right to court-appointed counsel does not include the right to have new counsel appointed, unless defendant can demonstrate to the trial court that his right to have counsel is in danger of substantial impairment, and defendant must give specific reasons why he desires new counsel. (*People* v. *Williams* (1970) 2 Cal.3d 894, 904-905 [88 Cal.Rptr. 208, 471 P.2d 1008].) It is insufficient merely to allege disagreements as to trial tactics or as to defendant's right to testify in his own behalf (*People* v. *Williams, supra,* 2 Cal.3d 904-905), nor is it enough to allege defendant's lack of confidence in his attorney and his refusal to cooperate with his attorney.

(*People* v. *Floyd* (1970) 1 Cal.3d 694, 705 [83 Cal.Rptr. 608, 464 P.2d 64].) What is more, the decision whether to appoint new counsel rests in the sound discretion of the trial court. (*People* v. *Jacobs* (1972) 27 Cal.App.3d 246, 263-264 [103 Cal.Rptr. 536].) Here appellant gave no specific reasons for his mistrust of his attorney (unlike *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], where the court would not hear the defendant's allegations). The record shows that defense counsel argued what issues were available to him. He filed extensive points and authorities and put on witnesses attacking the imposition of the death penalty and argued this matter vigorously to the court. He argued at length the motion to suppress the tapes from New Mexico, which the court denied. The record shows that the court appointed a psychiatrist to investigate appellant's mental capacity and his ability to premeditate both at the time of the offense and the time of the examination, per Penal Code sections 1026, 1368, and a confidential copy of the doctor's report was ordered furnished to defense counsel per Evidence Code section 1017. Since no plea of insanity or diminished capacity was offered at trial, it is inferable that the doctor found appellant legally sane at the time of the offense and fit to stand trial. Defense counsel engaged in pretrial discovery and succeeded in keeping from the jury's view the more inflammatory pictures of the victims, which were merely cumulative since there was no issue of the victims' identity. Counsel could not manufacture a defense where none existed. The case is unlike *In re Miller* (1973) 33 Cal.App.3d 1005 [109 Cal.Rptr. 648], wherein counsel neglected to subpoena prison medical records which defendant claimed would reveal a history of mental disease. ■ Here appellant specifies no relevant exculpatory evidence that his counsel neglected or refused to offer. The record presents no hint of a possibility, let alone a reasonable probability, that appellant might have been convicted of a lesser offense or acquitted had new counsel been appointed.

In summary, the record in this case exhibits ample evidence to support appellant's convictions and shows that he was treated with scrupulous fairness by the police and the trial court and given able representation by his appointed counsel. There is no indication that any of his constitutional rights have been violated. The judgments of conviction are modified to impose a life sentence instead of the penalty of death, and as so modified are affirmed.

Roth, P. J., and Beach, J., concurred.